LARIO, J.T.C.
Weymouth Township (Weymouth) appeals from a judgment of the Atlantic County Board of Taxation determining land and premises listed on the tax map as Block 99, Lot 1, owned by defendant, Memorial Park Family Practice Center, Inc., (Memorial Park) to be exempt from real property taxation pursuant to N.J.S.A. 54:4-3.6 for the tax year 1982. The original assessment levied by the municipality for 1982 was
Land: $ 12,000
Improvements: $107,500
Total: $119,500
It was stipulated that the sole issue involved is defendant’s right to an exemption from local property taxation; neither party contests the quantum of the original assessment.
*591 Weymouth as appellant in its direct presentation produced as its sole witness its tax assessor who testified that Memorial Park had no beds; it did not operate 24 hours a day; it was not open seven days a week; and, according to a statement included in its application filed for tax exemption, it provided medical services based upon a patient’s ability to pay. From these facts, she concluded that the facility failed to qualify as a hospital; therefore, it was not entitled to tax exemption under N.J.S.A. 54:4-3.6. No other additional factual basis to support this conclusion nor other testimony was presented by plaintiff.
Upon conclusion of its direct presentation, defendant moved for entry of summary judgment based upon the presumption of correctness of the judgment issued by the Atlantic County Board of Taxation which had declared the property exempt from taxation, citing in support therefor Pleasantville v. California Apartment Association, 4 N.J.Tax 519, 525 (Tax Ct.1982) and Pennwalt Corporation v. Holmdel Tp., 4 N.J.Tax 51, 55 (Tax Ct.1982).
Defendant’s reliance upon these cases for the proposition it advances is misplaced. In both of these cases the recognition of the existence of the presumption of correctness of county board judgments was based upon our Supreme Court’s holding in Riverview Gardens v. No. Arlington Boro., 9 N.J. 167, 87 A.2d 425 (1952) and the many cases which have since followed this ruling. However in all of these cases the issue involved was the quantum of the assessment. In none of these cases did the court discuss the proofs required by a taxing district as appellant from a county tax board judgment declaring a real estate line item as tax exempt.
New Jersey’s Constitution requires that all real property “shall be assessed according to the same standard of value, except as otherwise permitted herein” and that “exemption from taxation may be granted only by general laws ... exemptions from taxation may be altered or repealed, except those exempting real and personal property used exclusively for religious, educational, charitable or cemetery purposes, as de *592 fined by law, owned by any corporation or association organized and conducted exclusively for one or more of such purposes and not operating for profit.” N.J. Const. (1947), Art. VIII, § 1, pars. 1, 2.
N.J.S.A. 54:4-1 mandates that all real property “within the jurisdiction of this State, not expressly exempted from taxation or excluded from the operation of this chapter, shall be subject to taxation annually.”
 The above-quoted laws clearly establish that all real property within the jurisdiction of this State is presumed to be taxable. “The fundamental approach of our statutes is that ordinarily, all property shall bear its just and equal share of the public burden of taxation.” Presbyterian Homes v. Tax Appeals Division, 55 N.J 275, 283, 261 A.2d 143 (1970). Granting of an exemption from real estate taxation is a departure from the norm. “The burden of proving tax exempt status is upon the claimant.” Id. at 283, 261 A.2d 143. This burden never shifts and it remains upon the claimant both before the county board of taxation and in this court. Pingry Corp. v. Hillside Tp., 86 N.J.Super. 437, 207 A.2d 194 (App.Div.1965), rev’d on other grounds 46 N.J. 457, 217 A.2d 868 (1966); Bloomfield v. Academy of Med. of N.J., 47 N.J. 358, 221 A.2d 15 (1966).
In Pingry the school originally appealed as tax exempt 14 assessments levied upon its property, including seven faculty houses. The county board affirmed some of the assessments and reversed others. It granted the school’s claim of tax exemption on several school buildings including the seven faculty houses. On appeal to the then Division of Tax Appeals some of the county board’s judgments were affirmed and others, including the judgments granting exemption to the faculty houses were reversed. On appeal to the Appellate Division, after restating the principle that “[sjtatutes granting exemption from taxation represent a departure and consequently they are most strongly construed against those claiming exemption,” citing Princeton Univ. Press v. Princeton, 35 N.J. 209, 214, 172 A.2d 420 (1961), it stated further:
*593 ... and the burden of proving a tax-exempt status is upon the claimant. The party seeking an exemption has the burden of bringing itself clearly within the exempting statute and overcoming all doubts which are resolved against it. [citations omitted] Pingry, as to the dwelling facilities for its masters, has not carried that burden. [Pingry Corp. v. Hillside Tp., supra, 86 N.J.Super. at 448, 207 A.2d 194; emphasis supplied]
Since the Division of Tax Appeals was the last forum where factual findings were made, the Appellate Division obviously was referring to the burden of proof required in the trial before the Division when it stated “the burden of proving a tax-exempt status is upon the claimant____ Pingry, as to the dwelling facilities, ... has not carried that burden.” It is obvious therefrom, although Pingry was the appellant in those appeals denied by the county board and defendant in those where tax-exempt status was granted, the Appellate Division did not differentiate between their respective status in decreeing which party had the burden of proof.
Although the Supreme Court reversed the Appellate Division and granted the exemption, Pingry Corp. v. Hillside Tp., supra, it did not do so on the burden of proof issue; nor did it express disagreement with the Appellate Division’s affirmation concerning burden of proof; instead, it arrived at its conclusion “from a review of the record in light of the construction to be placed upon the statute.” 46 N.J. at 465, 217 A.2d 868. In fact, it approved the Appellate Division’s declaration as noted in its subsequent decision of Bloomfield, supra, when it cited its decision in Pingry as authority for this evidence principle. 47 NJ at 363, 221 A.2d 15.
In Bloomfield the Academy of Medicine’s tax-exempt claims for its properties were granted by judgments of the county board. The Division of Tax Appeals reversed the county board judgments, reinstating the assessments. The Appellate Division affirmed partially and remanded to the Division that portion of the appeal concerning the exempt status of the library. Although the Supreme Court, upon certification, reversed the Appellate Division and granted exemption for the library, it specifically cited with approval the burden of proof required by a tax-exempt claimant as set forth in Pingry when it stated:
*594 The fundamental approach of our statutes is that ordinarily all property shall bear its just and equal share of the public burden of taxation. As the existence of government is a necessity, taxes are demanded and received in order for government to function 51 AmJur.Taxation, § 9, p. 42. Statutes granting exemption from taxation represent a departure and consequently they are most strongly construed against those claiming exemption. The burden of proving a tax-exempt status is upon the claimant. Pingry Corp. v. Hillside Tp., 46 N.J. 457, 461 [217 A.2d 868] (1966). [Ibid.]
Before the Division of Tax Appeals in both Pingry and Bloomfield, the taxing district was the appellant from judgments granting exemptions, nevertheless, the Supreme Court iterated its oft-stated principle that the burden of proof to establish tax-exempt status is upon the claimant. It is concluded therefrom that before this court, which is the last fact-finding tribunal, regardless of which party is the appellant in an exemption case, the burden of proof to establish tax-exempt status is upon the claimant.
To hold otherwise would be not only legally incorrect, but it would also be most impractical and place an onerous burden upon the taxing district. When a county board grants an exemption, its judgment simply states: “Tax-exempt.” It does not specify the basis therefore; and, where the taxing district appeals it does so from the judgment. On appeal to this court, which is a trial de novo, the property owner is entitled to an affirmance of the judgment if it qualifies under any of the exemptions granted by N.J.S.A. 54:4-3.6 (hereinafter § 3.6). If, before us, the taxing district on its appeal has the burden of proof it would be required to establish the non-existence of facts by a preponderance of the evidence that the property owner does not qualify under each and every one of the exemptions enumerated in § 3.6. Such a burden was never contemplated by the Legislature nor decreed by our courts.
Where, as here, the appeal is from a county board judgment granting tax exemption, when the taxing district establishes that the property exempted is real property located within its municipality, it has overcome the presumption of correctness of the county board’s judgment as to that issue. Under such circumstances, a claim of exemption pursuant to *595 § 3.6 is an affirmative defense and it then becomes incumbent upon the property owner to establish its right thereto. New Brunswick City v. Rutgers Community Health Plan, 7 N.J.Tax 491, 495-496 (Tax Ct.1985).
Memorial Park claims that its real property is exempt from local taxation pursuant to the provisions of § 3.6 which, as of October 1, 1982, exempted:
... all buildings actually and exclusively used in the work of associations and corporations organized exclusively for the moral and mental improvement of men, women and children, or for religious, charitable or hospital purposes, or for one or more such purposes; ... the land whereon any of the buildings hereinbefore mentioned are erected, and which may be necessary for the fair enjoyment thereof, and which is devoted for the purposes abovementioned and to no other purpose and does not exceed five acres in extent; ... provided, the building is wholly controlled by and the entire income therefrom is used for said charitable, benevolent or religious purposes ....
The subject property which is operated as a health service facility is located in what is known as the Belcoville section of the township which is in a rural area of western Atlantic County. By auto transportation it is approximately 30 minutes or less from Vineland, Hammonton, Somers Point and Atlantic City and approximately one hour from the Camden-Philadelphia metropolitan area. The building was constructed in 1974 by a partnership consisting of physicians who conducted therein a for-profit medical practice. It was built on land leased under a 75-year agreement from several other local individuals. This for-profit organization ceased operations at the end of June 1976 due to the lack of profitability. At that time the land and building was immediately leased and operated as a medical center by defendant, Memorial Park, which was incorporated as a nonprofit organization on July 1, 1976 pursuant to Title 15 of the New Jersey statutes. Defendant states that it was organized for the purpose of providing health care to a medically underserved rural population. The certificate of incorporation named five trustees to serve for the first year of its existence; these included Dr. Robert W. Datesman, Dr. George S. Groch and Dr. Jack E. Hyman, the three original physicians who constituted the partnership that operated the for-profit medical practice prior to its transfer to defendant. As required by the *596 corporation’s by-laws and pertinent federal regulations, “in order that the corporation be better capable of serving the community’s needs,” its board of directors must be composed of representatives of the community and users of the center. With the exception of the first year of the corporation’s existence in compliance with federal regulations which coordinate such centers, no physician or other employee with the corporation has served as a voting director on the board. In 1982 the board consisted of various members of the community none of whom were physicians or employees of the corporation.
Dr. Robert Datesman, one of the original partners in the for-profit medical center, testified that when the facility was transferred to a nonprofit center, Memorial Park rented the building and equipment from his partnership. The total monthly payment by Memorial Park for the rental which included the land lease was $4,772. This relationship ended on October 17, 1979 when Memorial Park bought the land, building and equipment with funds provided by a Farmers’ Home Administration mortgage loan in the amount of $350,000 payable at 5% interest resulting in an amortized monthly payment of $1,880. Dr. Datesman stated that he was not involved in the financing arrangement other than his status as seller of the building and equipment and that the mortgage loan was made pursuant to an independent appraisal secured by the mortgagee. The land on which the building was erected was previously owned by a group of individuals who included Mary Barry, a Hamilton Township insurance broker, who later became a member of the board of directors and in 1980 she was elected its president. She provided all insurance coverage to the corporation until approximately two years ago.
After the transfer of possession in 1976, Dr. Datesman remained on as Memorial Park’s parttime medical director in which position he continued until his temporary departure in 1980. He returned as medical director in the latter part of 1981 and continued as such until the spring of 1982 at which time he terminated his position.
*597 He testified he never served as a member of the board of directors,[1] however, he did attend meetings in his capacity as medical director and served as a consultant to the board. His authority was limited to the supervision of physicians and other medical personnel and procedures but he did not have control over the center’s finances. He could make recommendations but he did not have control in making final decisions. Although a majority of his recommendations for personnel appointments and equipment were approved, they were not always accepted.
In delineating the management of the center, Beth Frankel, project director for Memorial Park during the period in question, testified that overall control was in the board of directors under whom was the medical director and the project director. The medical director had the authority to retain or terminate physicians, but the board had a right to review the director’s appointments. However, there normally were no problems since the board had no actual control over the director’s supervisory authority. Her original position with the center was office manager after which she became project director, the position she held until the merger of Memorial Park into OMNI Care/HMO on July 1, 1983. Although overall policy and financial management was the province of the board of directors, she, as project director, was responsible for these matters on a day-to-day basis. She originally answered to Dr. Datesman, however, this arrangement was altered at the request of the center’s funding organization by a change in its by-laws in January 1982 after which she answered directly to the board of directors. Salaries in the corporation were set by the personnel committee of the board of directors and they were determined essentially by the prevailing market rates in the area.
She stated that the purpose of this nonprofit corporation was to deliver primary health care to a rurally underserved area which this area was declared to be by the federal government *598 and the New Jersey Department of Health. Health care was provided on an ambulatory level and patients were expected to “walk in and walk out” or be “wheeled in or wheeled out.” There was no facility within the center to provide for overnight care; however, it is claimed that for the period of time in which the center is closed there is a physician on telephone standby to handle emergencies or to direct a patient to a hospital, if necessary.
Memorial Park provided the following general patient services:
1. Adult medicine
2. Internal medicine
3. Pediatric medicine
4. Family planning and marital counseling
5. Psychiatric counseling (group and individual)
6. Optometric medicine
During the relevant period, Memorial Park employed an average of between 3-V2 and 4-V2 physicians and staff positions plus several specialists on a parttime basis. It contracted with other specialists such as a general surgeon and an ear, nose and throat specialist on a flat rate basis with Memorial Park collecting from its patients for these services only the amount which the patient could afford. It also contracted with an orthopedic surgeon on a per-diem basis; and, with an optometrist and psychiatrist on a flat rate basis with similar payment arrangements to that described above.
Memorial Park was opened to the public approximately 53-V2 hours a week; it had office hours six days a week; and, there were at least one primary care physician and one pediatrician on duty call during the night to cover emergency calls.
Dr. Datesman testified he made it known to surrounding ambulance squads the type of services the center could handle; and that the center would accept emergency patients without regard to the patient’s ability to pay, it being the center’s policy to never turn anyone away. As the doctor stated: “We would see them; we would try to get paid; we had a sliding fee scale, but no one was ever denied care because of lack of funds,” and *599 he was sure no one was ever turned away from the center because of his inability to pay.
Testimony revealed that Memorial Park additionally operated a satellite center in Marmora, Cape May County. This center was open approximately 43 hours a week and Frankel indicated that Memorial Park employees split their working hours between Marmora and the Weymouth center. In July 1983, Memorial Park became part of OMNI Care/HMO, an HMO located in Vineland.
The parties stipulated that Memorial Park had received federal funding from the Bureau of Community Health Services, a division of the Public Health Service, Department of Health and Human Services, pursuant to 42 U.S.C.A., § 254c of the Public Health Service Act. Prior thereto, Memorial Park received funding through a health underserved rural area grant (HURA), however, this program was transferred into the rural health initiative program (RHI). Frankel stated that the purpose of the HURA and RHI programs was to provide health services to a medically underserved area.
Annually, Memorial Park must submit a needs assessment to the federal government as part of its application for federal funding. In preparing its annual application for federal funding, Frankel stated it was her responsibility to determine what health services were being offered in the area and by whom. From her study for the period in question she determined Memorial Park offered the following services which she claimed were not offered elsewhere in the geographic service area:
1. Internal medicine
2. Pediatrics
3. Family planning' services
4. Full range laboratory services
5. Radio-graphic services
6. Mental health services and counseling
7. Ear, nose and throat consultation
8. Out-patient general surgery (mid-level procedures)
However these services are available in several nearby medical centers and in the cities of Hammonton, Vineland, Somers *600 Point and Atlantic City, all of which have hospitals and medical facilities which do provide these services.
In order to receive funding pursuant to 42 U.S.C.A. § 254(c) it is required that a determination be made by the Department of Health and Human Services that an area is medically under-served. 42 U.S.C.A. § 254(c)(1). The amount of any grant made in any fiscal year may not exceed the amount by which the costs of operation exceed the total of (1) the state, local and other funds; and, (2) the fees, premiums and third-party reimbursements which the center may reasonably be expected to receive for its operation in such fiscal year. 42 U.S.C.A. § 254(d)(4)(A). In exchange, the center must offer reduced fees on the basis of the patient’s ability to pay. 42 U.S.C.A. § 254(e)(3)(F) Prankel stated that it was the official policy of the RHI that no person would be refused medical care because of an inability to afford medical services which policy was adhered to by Memorial Park.
Prior to July 1, 1980 a flat fee of $7 was charged to those patients unable to afford the full fee; however, this service was limited. As part of its agreement to receive funding from the federal government, Memorial Park was also required to organize a sliding fee scale which allowed Memorial Park to provide its services based upon the patient’s ability to pay. Beginning July 1, 1980 a formal sliding scale fee system was adopted. The sliding fee which varied depending on a family’s size and income was computed by Memorial Park through the use of a standard form which it gave to its patients and which requested various information as to the patient’s income, family size and circumstances. A family was not required to pay the full fee until its income was twice the poverty level. Prom 1981 to 1983 over 1,000 patients were provided service on this sliding scale.
In addition to accepting a sliding fee scale, Memorial Park was also required to accept Medicare and Medicaid payments, provide for pharmacy services for those who could not afford to pay a full fee (which was accomplished through a contractual arrangement with local pharmacies), provide adult family and *601 pediatric medicine, provide family planning services and also provide for basic lab services. Moreover, Memorial Park also made a fee reduction allowance for other payments by third parties. Frankel stated that allowances were made to cover the difference in payments made from Blue Cross and Blue Shield and from Southshore Plan (a HMO in which Memorial Park participates) and the amount Memorial Park actually billed for its services.
Frankel estimated that during 1981 approximately 50% of all Memorial Park users received some sort of a discount from the normal fee, either from some type of third-party payment discount which included Medicare and Medicaid payments, or under the sliding fee scale program. In exchange for these reduced fees and sometimes no charge, Memorial Park was given the following funding by the federal government:
July 1, 1980 to June 30, 1981 — $265,000
July 1, 1981 to June 30, 1982 — $349,016
July 1, 1982 to June 30, 1983 — $281,000
Memorial Park was required to fully account to the funding organization as to how and where the grant money was being spent. It was required to report to the government the amount of money spent on personnel, contractual obligations, for employee fringe benefits, equipment and to allocate its expenditures for the various services such as mental health, education, etc.
The parties stipulated that on May 25, 1977 Memorial Park was determined to be exempt from federal income taxation pursuant to I.R.C. § 501(c)(3) and on July 19, 1979 it received exemption status under I.R.C. § 170(b)(l)(A)(vi). It is not required to collect or remit sales tax to the State of New Jersey having been exempted in 1977. They also placed in evidence certain financial statements prepared for Memorial Park which revealed that Memorial Park had a net operating profit of $16,441 for the year ending June 30, 1981 and it sustained a net operating loss of $5,998 for the year ending June 30, 1982. These statements also revealed the federal funding received and total income of Memorial Park as follows:
*602 Year Ending Federal Other* Total
6/30/77 $169,908 $465,871 $295,963
6/30/78 212,838 646,049 433,211
6/30/79 147,279 568,472 421,193
6/30/80 180,000 656,930 476,930
6/30/81 265,000 704,064 439,064
6/30/82 349,816 744,289 394,473
6/30/83 281,000 792,658 511,658
The excess of revenues over expenses is as follows (figures in parentheses indicate a loss):
Y/E 6/30 Amount
1977 $(24,871)
1978 81,114
1979 (37,401)
1980 ( 5,332)
1981 16,441
1982 ( 5,998)
1983 34,874
In addition to direct medical care, Memorial Park also provided health education services and physician care for pupils in several local schools. These services included performing physical examinations, special child study team evaluations, health education programs and sports physicals. During the 1981-1982 school year, Memorial Park provided these services to Weymouth Township schools at a flat fee of $500 a year no matter how many students received services. Its normal charge for 25 hours of physician care, which she estimated was applicable, would have been approximately $2,500. Frankel further stated that Memorial Park charged a reduced fee to Weymouth schools because it wanted to make a contribution to the community in which the center was located.
Memorial Park has also provided physicians’ services to other local school districts. From 1978 through 1980, Upper Township in Cape May County received services at a cost of between $2,500 and $3,000 a year. During the subject period services *603 were provided to Estelle Manor schools at a cost of $300 a year and to Hamilton Township, Atlantic County, at a cost of $4,500 a year. In 1982 its services were expanded to include two local parochial schools, St. Vincent de Paul and St. Nicholas, at no charge. Memorial Park also provided a low cost immunization program for children who were initially entering school.
Since Memorial Park was a federally funded, nonprofit facility it received from the New Jersey Health Department free diphtheria, tetanus, mumps, measles, rubella and oral polio immunization vaccines which it administered to children at a nominal cost of $5 for injections and at no cost for the orally administered polio vaccine. Frankel estimated that a private practitioner would charge approximately $20 for a mumps, measles and rubella shot.
Additionally, health education services were provided both on a community-wide level and on an individual patient level. The services provided on a community level included organized lectures given in the area by physicians and other medical personnel which deal with various health topics such as diabetes, heart attack/coronary problems, alcohol and drug abuse and sex education. Individual patient counseling regarding diabetes, weight control and other similar health problems were conducted by either a health educator, family educator or a family nurse. These counseling periods were usually scheduled around a visit to a physician or other scheduled lab work. The fee for this counseling was usually included in the cost of the physician’s visit or lab work.
Frankel further stated that during 1982 Memorial Park worked with the family life committees of several local schools and PTA organizations and developed a sex education program for the schools pursuant to the rules of the State of New Jersey.
Additionally, the medical director provided his services at local “nutrition sites” where he lectured to senior citizens about hypertension, diabetes and diets for older persons. These lec *604 tures were arranged through the auspices of the Atlantic County Health Department and were given free of charge.
Memorial Park’s off-center program also included during the summer months, the administering of physical exams to the children of migrant workers in Buena. It was engaged to provide these exams by the Office of Government Programs for which it was paid $9 a child by Medicaid. Frankel estimated that its normal charge for these services was between $16 and $20 and that during 1981 and 1982, it examined approximately 125 to 150 children.
Another service rendered by Memorial Park during the subject period was the provision of mental health care. During the July 1981 to July 1982 period, Memorial Park received a supplemental award to increase its mental health services. Frankel stated that special emphasis was placed on teenage suicide and, in conjunction with the Atlantic County Mental Health Association and Family Service Association, it helped to provide a film on teenage suicide which was presented in various local school districts. During the period in question the film was shown to approximately 1,000 students at no charge.
Although the issue before the county board appears to have been whether Memorial Park’s activities constituted “hospital purposes” within the purview of § 3.6, at trial it was Memorial Park’s position that, based upon the above-stated facts, “it is organized and operated for charitable purposes and that its real property is used for such purposes.” The taxing district counters that to qualify for tax exemption the land and buildings must be exclusively used for charitable purposes and that Memorial Park does not meet this standard but instead, it is in reality a commercial enterprise.
Under § 3.6 exemption from taxation is tested by exclusiveness both of purpose of the organization and of use of the property. Princeton Univ. Press v. Princeton, supra, 35 N.J. at 214, 172 A.2d 420. From a close scrutiny of the claimant’s charter and its use of the property it is concluded that claimant fails to meet either of these tests.
*605 The second article of Memorial Park’s certificate of incorporation states: “The purposes for which this corporation is formed are to expand and coordinate rural health care services in southern New Jersey with a system of comprehensive primary care with appropriate speciality support.” The certificate was subsequently amended without change to this article. As drafted there is nothing in this wording to preclude the corporation from engaging in nonexempt activities.
Providing health care services does not necessarily constitute creation of a hospital or an organization exclusively providing hospital services pursuant to the statute. Nor is it organized exclusively for any of the other purposes exempted by § 3.6. All medical clinics and health maintenance organizations (HMOs) provide health care services but they all do not meet the requirements necessary to obtain tax-exempt status. Memorial Park has no facility within the center to provide for overnight care, it being open but six days a week for only 53)4 hours a week. In New Brunswick v. Rutgers Community Health Plan, supra, Judge Andrew of this court held that although an HMO delivers health care services, an HMO is not a hospital. The result therein was based upon his conclusion that implicit within the definition of the word “hospital” as used in § 3.6 is the requirement for continuous ongoing care. It identifies an institution which as a general rule is a form of a specialized hotel having facilities for furnishing patients with complete ongoing, 24 hour, continuous medical care with patient bed-checks, food and shelter. 1 N.J.Tax at 500-501.
Many medical clinics which do not meet the tax-exempt requirements of § 3.6 nevertheless can provide the services permitted by defendant’s charter; among these are HMOs. This is borne out by the fact that in July 1983, Memorial Park did become part of OMNI Care/HMO. Since the purposes set forth in the corporation’s charter are not exclusively for charitable or hospital purposes it fails to meet the first of the two-prong test.
*606 Nor does the center meet the requirement of the second prong of the test, exclusive operation. Since Memorial Park was funded by the federal Public Health Service implementing a congressional mandate to make medical services available to persons in rural and other medically underserved areas, it claims that by its compliance therewith, it is performing a charitable service by assisting the government in performing its activities.
As our Supreme Court stated in Presbyterian Homes, supra:
... the term ‘charity’ in a legal sense is a matter of description rather than a precise definition. Therefore, the determination of whether property is devoted to charitable purposes depends upon the facts or circumstances of each case. As a guide, however, it should be borne in mind that a sometimes stated justification for charitable tax exemptions is that if the charitable work were not being done by a private party, it would have to be undertaken at public expense. [55 N.J. at 285, 261 A..2d 143]
From the history of the ownership of the lands and buildings and of the medical partnership clinic which was operating therein at a loss, it can readily be inferred that the organization of defendant corporation by the five trustees (which included the three medical partners) was not completely altruistic. Although ownership and operation by claimant’s predecessor is not binding upon a claimant in determining its purposes, it may aid in interpreting the present operation.
The building was originally built by the partnership on land leased for 75 years. The partnership admittedly was unprofitable resulting in their organizing Memorial Park which was funded as hereinabove set forth. Initially Memorial Park rented the real and personal property at $4,772 a month. The receipt of funding was subsequently changed[2] from HURA to RHI. Under RHI it was provided:
The costs for which a grant may be made under paragraph (1) (A) or (1) (B) may include the costs of acquiring and modernizing existing buildings (including the costs of amortizing the principal of, and paying interest on, loans) and the costs of providing training related to the provision of primary health services, *607 supplemental health services and environmental health services, and to the management of community health center programs.
By virtue of the above provision, the property was purchased by the center. The grantors, all of whom were closely connected with the center (the three partners as original incorporators and the land owner as a director and insurance broker for the center) were able to receive in cash the full appraised value of $350,000 for their property. The record does not disclose the value of the land nor the original and depreciated costs of the improvements and equipment. It appears that, at least partially, the purpose of the formation of the center was to help rescue a financially disastrous investment.
For the fiscal year ending June 30, 1981, Memorial Park had a total income of $704,064 of which $365,000 was federally funded and the balance of $439,064 from other sources. The latter sum was less contractual allowances and adjustments, amounting to $52,956. For the fiscal year June 30, 1982 the total received was $744,289 of which $349,816 was federal and $394,473 from other sources which also was less contractual allowances and adjustments of $63,861. The contractual allowances and the adjustment figures do not include sums billed and written off, referred to as bad debts, which were estimated to be $34,559 for 1981 and an actual figure of $24,808 for 1982.
When asked what percentage of the total overhead costs was attributable to charitable activities, Frankel answered that she did not know. It is apparent from the above figures that $87,515 for contractual allowances and bad debts compared to an income of $704,064 for 1981 and $88,669 compared to $744,-289 for 1982 does not suggest extensive charitable activity. The services rendered to those people who required fee adjustments is a small fraction of the grant monies: $265,000 received in 1981 and $349,816 in 1982.
Based upon her sampling of 237 patients’ records (by looking at every 20th patient’s card which projected to 4,740 patients) Frankel determined that 41% had insurance coverage; 12% was approved by Medicare; 14% was covered by Medicaid; the remaining 33%, or 78 patients, were billed directly. Of these 78 *608 patients, 22, amounting to 9%, were on a sliding fee payment scale.
Memorial Park is in direct competition with other doctors, medical facilities and hospitals within a 30-mile radius. Does it make any difference whether the funds received by the provider of reduced services is from governmental funding or private insurance? Is the first recipient determined to be charitable and the second not? Many hospitals, doctors and dentists receive payment from Blue Cross, Blue Shield, Medicare, Medicaid and private insurance companies based upon a reduced fee. In many instances these reduced payments are accepted as payment in full. Can it be concluded that their services thereby qualify as charitable under § 3.6?
With the exception of the reduced fee charged to the Weymouth Township school and no fee to the two parochial schools, regular fees were charged to the other school districts. The student nurses in the Atlantic County vo-tech school program worked full days and weeks at the center without compensation.
The health education, mental health and nutrition programs, although done without charge to the recipients, were in effect, paid for by the funding contributed by RHI which required most of these programs to be provided by the center for it to qualify for the grant.
As heretofore noted, in Presbyterian Homes, supra, one of the justifications for charitable tax exemptions is that if the charitable work were not being done by a private party, it will have to be undertaken at public expense. 55 N.J. at 285, 261 A. 2d 143. The quid pro quo for the granting of exemption from payment of taxes is that the State is relieved pro tanto from the necessity of performing. Here the alleged charitable work is being paid for by the federal government. Accordingly, the justification for tax exemption does not exist.
Additionally, it does not appear that Congress considered this program under which defendant was funded as charitable nor the centers funded thereby as charitable organizations. They *609 were developed to be competitive with private providers. Although under current health care financing mechanisms these centers were not designed to be self-sufficient based upon passage of future legislation providing financial aid, they were projected as ultimately becoming self-sustaining. Public Law 95-626, a further amendment to 42 U.S. C.A. § 254c, treated at 1978 U.S. Code Congressional and Administrative News states:
One of the successful aspects of the community health center program has been the development of these activities as effective and efficient entities competitive with private providers. Community health centers were not designed to become self-sufficient under current health care financing mechanisms. However, community health centers would, in the event of the passage of some form of national, comprehensive financing mechanism provide the needed capacity to help meet increases in demand for services and, in so doing, reduce increases in medical care costs which might result from such increases in demand Communityhealth centers have, however, moved in the direction of becoming freestanding providers tkrough management improvements and an emphasis on improved productivity____[at 9134, 9144; emphasis supplied]
Memorial Park differs from an ordinary medical center in that although on average it charges according to an area-wide fee schedule, it collects from patients covered by insurance, Medicaid or Medicare only that sum permitted thereby and for the remainder of its patients it collects whatever sum the patient can afford with the short fall being subsidized by the federal government. The “free” services rendered are but a small percentage of its total charges. The center’s total activity does not qualify it as a charity.
In its posttrial brief, Memorial Park claimed that its organizational documents:
... show a purpose to provide health care to a medically underserviced rural population. As part of its work, Memorial Park has, since its inception, provided health awareness by means of educational programs and materials for individual patients and the community at large. Memorial Park submits that such activities are in furtherance of men, women and children [sic] within the provisions of N.J.S.A. 54:4-3.6.
Although these activities are worthy and Memorial Park is to be commended for providing them, these functions are merely incidental to furnishing medical services and do not qualify the claimant’s operation as tax exempt under the mental and moral improvement category of § 3.6. Additionally, as previously *610 concluded these “free” incidental services offered by Memorial Park are not exclusively charitable in nature since the center is required to provide them in order to qualify for its funding and it is amply reimbursed for these activities by the federal government.
The property under appeal is not entitled to a tax exemption since it is neither organized nor operated exclusively for charitable purposes within the purview of N.J.S.A. 54:4-3.6. As stated in New Brunswick v. Rutgers Community Health Plan, supra, if the purpose of § 3.6 were to exempt all health care facilities, the Legislature could have expressly so provided. It did not. Whether such facilities should be tax-exempt is appropriately a matter for the Legislature. 7 N.J.Tax at 507-508.
The judgment of the Atlantic County Board of Taxation is reversed and the original assessment is reinstated.

 This statement appears to be in conflict with the information contained in Memorial Park's certificate of incorporation.

 Gross income less contractual allowances and adjustments.

 The date of this change was not placed in evidence. Presumably it occurred prior to the purchase date.