798 A.2d 120 (2002)
351 N.J. Super. 262
SOUTHERN JERSEY FAMILY MEDICAL CENTERS, INC., Plaintiff-Appellant,
v.
CITY OF PLEASANTVILLE, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued April 17, 2002.
Decided May 30, 2002.
*121 Richard M. Conley, Haddonfield, argued the cause for appellant (Archer & Greiner, attorneys; Mr. Conley, of counsel and on the brief; Robert J. Fogg, on the brief).
*122 David D. Blake, Mount Laurel, argued the cause for respondent (Shaffer, Bonfiglio, Scerni & D'Elia, attorneys; Mr. Blake, of counsel and on the brief).
Before Judges KING,[1] CUFF and WINKELSTEIN.
The opinion of the court was delivered by WINKELSTEIN, J.A.D.
Plaintiff appeals the Tax Court's grant of summary judgment in favor of defendant City of Pleasantville, holding that plaintiff was not entitled to an exemption from local property taxes for the 1999 tax year for its property located at 932 South Main Street, Pleasantville. The Tax Court found that plaintiff was organized exclusively for a tax-exempt purpose and that the use and operation of the property was not conducted for profit, but because the property was not actually used for charitable purposes, plaintiff did not qualify for a tax exemption. The Tax Court reasoned that the property was not used for charitable purposes because plaintiff received substantial government funding and virtually no voluntary charitable contributions. We disagree with the judge's conclusion and reverse.

I
Southern Jersey Family Medical Centers, Inc. (Southern Jersey) is a non-profit corporation organized pursuant to N.J.S.A. 15A:1-1 to -15-2. It is a community health care facility that provides health and dental care irrespective of a patient's ability to pay. Its primary patient population "is medically underserved or indigent." Southern Jersey has four locations in South Jersey, with one center located in Pleasantville.
Southern Jersey was formed on March 11, 1977 as "Sa-Lantic Health Services, Inc." On October 8, 1998, the corporation filed an amended certificate of incorporation, changing its name to "Southern Jersey Family Medical Centers, Inc." and adding Article Eight, which provides, in pertinent part: "The purposes for which this Corporation is formed are exclusively charitable...." According to Southern Jersey's bylaws, adopted May 9, 1994 and amended April 13, 2000, its objectives are:
A. To provide and promote effective, high quality, primary and preventive health and dental care services for residents and migrant/seasonal farm workers within the service area, regardless of their ability to pay.
B. To increase the availability and accessibility of high quality, primary heath and dental care services by reducing financial and cultural barriers to such services.
C. To promote the utilization, expansion, and integration of already existing federal, state, county, and private health services in order to deliver high quality, efficient, and economic health care.
D. To meet the primary care needs of the community that is served.
E. To assure the continuity of care of the patients that are served throughout the complex health care system.
Southern Jersey provides preventative care and treats existing medical conditions. It also conducts educational programs to inform the community about different health concerns. None of Southern Jersey's centers treat "exclusively *123 indigent people;" rather, the centers "treat anyone." Southern Jersey charges patients who do not have health insurance according to a sliding fee scale that is based upon each patient's income.
The Pleasantville center takes care of "anyone who presents [himself or herself] for treatment. The majority of patients who present for treatment ... are patients who are ... either indigent or low income, or have no insurance and low income." Some of these patients have "poor insurance," meaning that they have insurance, but "they're not paying for the services on an out-patient basis. So they don't have any other resource, any place to go...." While migrant farm workers comprise approximately ten percent of all Southern Jersey's patient base, "hardly any" migrant workers are treated at the Pleasantville center.
According to its chief executive officer, Southern Jersey provides "primary health care services to a population that is medically underserved or indigent. That's our mission. That's what we do in Pleasantville.... We do immunizations for children. If you are sick we take care of you." For pregnant mothers, Southern Jersey provides "not only an obstetrician [OB], but also an OB coordinator, [nutritionist], [and] social service counselor."
The six doctors at Southern Jersey each make an average annual salary of $110,721. The executive director earns a salary of $106,730. The medical director earns $50,600 for part-time employment. The nutritionist earns $44,500 each year, the social worker earns $28,500, nurses average $26,000 a year and medical assistants earn $24,500.
In 1999, Southern Jersey had a patient base of 13,856 patients. Sixty-three percent of that base8,730 patientswere at or below the poverty level. Forty-four percent were uninsured; thirty-nine percent used Medicaid; and four percent used Medicare. Approximately thirteen percent of the patient base had private insurance. During a recent twelve-month period, Southern Jersey collected only $120,859 of its total $1,928,414 billed to self-paying customers on the sliding fee scale, representing six percent of the amount billed.
Southern Jersey has been designated as a community health center pursuant to 42 U.S.C.A. 254c. As such, it provides primary health services for all residents in the area it serves. It services medically underserved populations, defined as "the population of an urban or rural area designated by the Secretary [of Health and Human Services] as an area with a shortage of personal health services...." 42 U.S.C.A. 254c(b)(3). As a community health center, it is entitled to grants to enable it to "plan and develop the provision of health services on a prepaid basis to all of the individuals" which the centers serve. 42 U.S.C.A. 254c(d)(C). Federal regulations require community health centers to prepare "a schedule of fees or payments for the provision of its services designated to cover its reasonable costs of operation and a corresponding schedule of discounts adjusted on the basis of the patient's ability to pay." 42 C.F.R. § 51c.303(f). The centers are also required to "provide for a full discount to individuals and families with annual incomes at or below" poverty income guidelines and "for no discounts to individuals and families with annual incomes greater than twice" those guidelines. Ibid. They are to be operated in a manner "such that no person shall be denied service by reason of his inability to pay...." 42 C.F.R. § 51c.303(u).
For calendar year 1999, Southern Jersey's taxes were assessed as follows: $102,400 (Land) + $245,200 (Improvement) *124 = $347,600. According to its tax returns, Southern Jersey's meaningful revenues [2] were allocated as follows:

1) For the fiscal year ending February 28,1997:
Federal Grants $ 898,788
(24.4% of total revenue)
Program Service Revenues[3] $ 2,194,795
(74.4% of total revenue)
Medicaid Managed Care ($1,403,463)
Medicare/Medicaid Payments ($ 67,314)
"N.J. Uncomp. Care" ($ 724,018)
 ___________
TOTAL GOVERNMENT FUNDING $ 3,093,583
Self-pay (from patients directly) $ 173,509
Other Third-Party Payments $ 368,879
Private Charitable Contributions $ 3,677,822
 ____________
TOTAL REVENUE $ 3,677,822
2) For the fiscal year ending February 28,1998:
Federal Grants[4] $ 1,446,382
(33% of total revenue)
Program Service Revenues $ 2,398,543
(66.5% of total revenue)
Medicaid Managed Care ($ 493,358)
Medicare/Medicaid Payments ($ 1,161,286)
"N.J. Uncomp. Care" ($ 743,899)
 ______________
TOTAL GOVERNMENT FUNDING $ 3,844,925
Self-Pay $ 356,802
Other Third-Party Payments $ 151,666
Private Charitable Contributions $ 1,059
 _____________
TOTAL REVENUE $ 4,370,922

*125
3) For the fiscal year ending February 28, 1999:
Federal Grants $ 991,636
(23.8% of total revenue)
Program Service Revenues $ 2,539,675
(75.7% of total revenue)
Medicaid Managed Care ($691,247)
Medicare/Medicaid Payments ($971,372)
"N.J. Uncomp. Care" ($877,056)
 ____________
TOTAL GOVERNMENT FUNDING $ 3,531,311
Self-Pay $ 437,186
Other Third-Party Payments $ 171,241
Private Charitable Contributions $ 1,802
 ___________
TOTAL REVENUE $ 4,158,258

In rendering his decision, the Tax Court judge lumped government grants together with program service revenues received from government sources. He concluded that Southern Jersey received "an average of eighty-five percent ... of its annual funding from the federal and state government" with "[t]he remaining fifteen percent... obtained through direct payments through patients, private insurance companies, and other investments." The Tax Court judge concluded that Southern Jersey is "amply compensated for the discount services provided through the government funds received, which is a substantial part of [Southern Jersey's] annual income." He found that the government funding, "coupled with its ability to support itself with virtually no voluntary charitable contributions does not lessen the government's burden, and necessitates a finding that [Southern Jersey] is not entitled to exemption from taxation under N.J.S.A. 54:4-3.6."

II
In 1999, N.J.S.A. 54:4-3.6,[5] which provides property tax exemptions for non-profit organizations read, in pertinent part:
The following property shall be exempt from taxation under this chapter: [A]ll buildings actually and exclusively used in the work of associations and corporations organized exclusively for ... charitable purposes; ... provided, in case of all of the foregoing, the buildings, or the lands upon which they stand, or the associations, corporations or institutions using and occupying them as aforesaid, are not conducted for profit, except that the exemption of the buildings and lands used for charitable [or] benevolent ... purposes shall extend to cases where the charitable [or] benevolent ... work therein carried on is supported partly by fees and charges received from or on behalf of beneficiaries using or occupying the buildings; provided the building is wholly controlled by and the entire income therefrom is used for said charitable [or] benevolent ... purposes.
*126 All real property within the jurisdiction of the State, not expressly exempted from taxation, is presumed taxable. Weymouth Tp. v. Mem'l Park Family Practice Ctr., Inc., 7 N.J. Tax 589, 592 (Tax 1985); N.J.S.A. 54:4-1. The burden of proving tax-exempt status is upon the claimant. Presbyterian Homes of the Synod of New Jersey v. Division of Tax Appeals, 55 N.J. 275, 261 A.2d 143 (1970). To obtain this local property tax exemption, a taxpayer must meet the following three criteria: (1) it must be organized exclusively for the moral and mental improvement of men, women and children; (2) its property must be actually and exclusively used for the tax-exempt purpose; and (3) its operation and use of its property must not be conducted for profit. Paper Mill Playhouse v. Millburn Tp., 95 N.J. 503, 506, 472 A.2d 517 (1984).
The Tax Court properly determined that Southern Jersey was organized exclusively for a charitable purpose, in satisfaction of part one of the Paper Mill test, because Southern Jersey's amended Certificate of Incorporation states: "The purposes for which this Corporation is formed are exclusively charitable...." See 1711 Third Ave., Inc. v. City of Asbury Park, 16 N.J. Tax 174, 180 (Tax 1996) ("Whether the first requirement is met is to be determined by the statement of purposes in the owning entity's certificate of incorporation."); Salt & Light Co. v. Mount Holly Tp., 15 N.J. Tax 274, 280 (Tax 1995) (finding that the company's amended certificate of incorporation established that it was organized exclusively for a charitable purpose), aff'd o.b., 16 N.J. Tax 40 (App.Div.1996), certif. denied, 148 N.J. 458, 690 A.2d 606 (1997).
The judge also correctly determined that Southern Jersey is a non-profit entity, and that it satisfies part three of the Paper Mill test because Southern Jersey provides medical and dental services to patients "regardless of their ability to pay." Pleasantville does not dispute that Southern Jersey is a non-profit entity.
The issue of whether the Southern Jersey property is actually and exclusively used for a tax-exempt charitable purposethe "essential consideration in matters of tax exemption"is more difficult. See Church Contribution Trust v. Mendham Borough, 9 N.J. Tax 299, 307 (Tax 1987), aff'd as modified, 224 N.J.Super. 643, 541 A.2d 249 (App.Div.1988). In finding that Southern Jersey did not satisfy this requirement, the Tax Court relied heavily upon the following language from Presbyterian Homes:
It is evident from the above definition that the term `charity' in a legal sense is a matter of description rather than a precise definition. Therefore, the determination of whether property is devoted to charitable purposes depends upon the facts or circumstances of each case. As a guide, however, it should be borne in mind that a sometimes stated justification for charitable tax exemptions is that if the charitable work were not being done by a private party, it would have to be undertaken at public expense.

[55 N.J. at 285, 261 A.2d 143 (citations omitted).]
The Tax Court judge found that the government was already paying for Southern Jersey's charitable work by contributing eighty-five percent of Southern Jersey's revenues; thus, the court concluded that the government was not being relieved of its burden to warrant tax-exempt status. For a number of reasons, we find the court's reliance upon Presbyterian Homes misplaced.
First, the facts in Presbyterian Homes are distinguishable from the facts in this case. In Presbyterian Homes the tax exemption *127 was sought for an upscale housing complex where all residents were required to pay a "founder's fee" for lifetime use of their respective apartments. The facility provided "gracious retirement living" for those who were able to pay. 55 N.J. at 290, 261 A.2d 143. The Court stated, "[w]e fail to see how any invidious discrimination would arise if, as petitioner describes itself in a brochure, Meadow Lakes with its `gracious retirement living,' is denied tax-exempt status." Ibid. The Court found that although the petitioner's desire to "develop a congenial environment for elderly persons[]" was "to be commended[,]" its actions and services were "readily within the ability of any organization or even individuals to perform." Id. at 288, 261 A.2d 143.
Here, it is not disputed that Southern Jersey provides medical services at reduced rates to a significant number of persons who live at or below poverty levels. The Tax Court judge recognized that there is "no dispute [Southern Jersey] provides medical services to patients in need of care, regardless of their ability to pay." The record does not disclose any private enterprise in the Pleasantville area that performs this same service. Southern Jersey's facility in Pleasantville is not located in the vicinity of a hospital. It is conveniently located for Pleasantville residents, many of whom are poor and unable to pay market rates for health-care services. Should Pleasantville residents be unable to afford the services offered by profit-making health-care facilities in the area, their only alternative to Southern Jersey would be to receive care at hospital emergency rooms, located in noncontiguous municipalities. Thus, unlike the taxpayer in Presbyterian Homes, Southern Jersey provides vital services which are unique to the area where the property is located.
Aside from being factually distinguishable, there is a more compelling reason to distinguish this case from Presbyterian Homes. The government funds paid to Southern Jersey in the form of Medicare and Medicaid payments, and the funds from what are described in the tax returns as "N.J. Uncomp. Care," are qualitatively different from the government funds referred to in Presbyterian Homes. Presbyterian Homes received an outright federal grant to construct a health-care facility as part of its project. Here, the bulk of the government funds received by Southern Jersey are payments for services rendered; they are not grants.
Southern Jersey receives significant payments from Medicaid. Medicaid was created by Congress in 1965 to "provide medical services to families and individuals who would otherwise not be able to afford necessary care." Barney v. Holzer Clinic Ltd., 110 F.3d 1207, 1210 (6th Cir.1997); 42 U.S.C.A. § 1396. The Program is a "joint federal-state program of medical assistance established by Title XIX of the Social Security Act, 48 U.S.C. § 396a-§ 396u." County of Camden v. Waldman, 292 N.J.Super. 268, 278, 678 A.2d 1101 (App.Div.1996), certif. denied, 149 N.J. 139, 693 A.2d 109 (1997). Although states are not required to participate in the program, once they do, they need to comply with federal Medicaid statutes and regulations. Ibid. (citations omitted). Medicaid service providers must accept the state-approved Medicaid payment as payment in full; patients may not be required to pay anything above that amount. Ibid.; 42 C.F.R. 447.15 ("A State plan must provide that the Medicaid agency must limit participation in the Medicaid program to providers who accept, as payment in full, the amounts paid by the agency plus any deductible, coinsurance or copayment required by the plan to be paid by the individual. However, the provider may *128 not deny services to any eligible individual on account of the individual's inability to pay the cost sharing amount imposed by the plan in accordance with § 431.55(g) or § 447.53.").
Southern Jersey also receives Medicare payments. Medicare is administered by the United States Department of Health and Human Services, through the Health Care Financing Administration. United States v. Mackby, 261 F.3d 821, 824 (9th Cir.2001). Medicare Part A provides hospital insurance benefits to the elderly and disabled, while Medicare Part B is "a federally subsidized, voluntary insurance program that pays a portion of the cost of certain medical and other health services not covered by the Part A program...." Ibid. Part B is paid for in part by the insured, who pays monthly premiums. Schweiker v. McClure, 456 U.S. 188, 190, 102 S.Ct. 1665, 1667, 72 L. Ed.2d 1, 4 (1982). As is the case with Medicaid, a health-care provider must accept the determination by insurance carriers under contract with the federal government as to the amount of reimbursement, and with the exception of co-insurance and deductibles, may not seek the difference from the beneficiary. Manakee Prof'l Med. Transfer Serv., Inc. v. Shalala, 71 F.3d 574, 577-78 (6th Cir.1995) (citing 42 U.S.C. § 1395u(b)(3)(B)(ii)).
Finally, although the record does not explain the nature or source of the revenues labeled "NJ Uncomp. Care" in Southern Jersey's tax returns, they are presumably received from the Health Care Subsidy Fund, N.J.S.A. 26:2H-18.51e, a successor to the New Jersey Uncompensated Care Fund, see N.J.S.A. 26:2H-18.4 (expired), which provides health-care assistance to eligible New Jersey residents who meet certain asset and income requirements. See Health Care Systems Analysis, Health Care for the Uninsured Program (May 1997), available at http:// www.state.nj.us/health/hcsa/ccfactsh.htm; see also N.J.S.A. 26:2H-18.51e; N.J.S.A. 26:2H-18.47; United Wire Metal and Mach. Health and Welfare Fund v. Morristown Mem'l Hosp., 995 F.2d 1179, 1189 (3rd Cir.1993); New Jersey Hosp. Assoc. v. Fishman, 278 N.J.Super. 469, 470, 651 A.2d 501 (App.Div.) (citing N.J.S.A. 26:2H-18.24), certif. denied, 140 N.J. 329, 658 A.2d 728 (1995).
Given this statutory scheme, we do not equate the receipt of these payments with the government funding referred to by the Presbyterian Homes' Court. These funds received by Southern Jersey were not outright grants. It earned these funds by providing services to persons too poor to seek medical services from traditional health-care providers.
Additionally, not all public grants paid to a non-profit corporation will bar a property tax exemption. In Paper Mill, our Supreme Court found that a non-profit theater was entitled to an exemption from local property taxes. As partial support for its conclusion that the theater met the "exclusive use" test, the Court pointed to "the tremendous financial support and extraordinary recognition Paper Mill has received from the State of New Jersey...." 95 N.J. at 515, 472 A.2d 517. This reference was, in part, to the State's appropriation of $600,000 to the theater to aid in its reconstruction after a fire destroyed the theater in 1980. Id. at 512, 472 A.2d 517. Thus, government aid, which is generally not provided to a for-profit commercial enterprise, may support a taxpayer's position that it is exclusively engaged in charitable services. See also O'Connell v. Montclair State Univ., 171 N.J. 484, 494-95, 795 A.2d 857 (2002) (where, in the context of the Charitable Immunity Act, the Court stated that receipt by a charitable entity of government *129 funds concomitant with "`some measure of government control does not transform a private non-profit corporation into a governmental instrumentality.'") (quoting Morales v. New Jersey Acad. of Aquatic Sciences, 302 N.J.Super. 50, 55, 694 A.2d 600 (App.Div.1997)).
The State of New Jersey has identified ensuring access to medical care to its citizens as a public purpose. According to the Health Care Cost Reduction Act, "[i]t is of paramount public interest for the State to take all necessary and appropriate actions to ensure access to and the provision of high quality and cost-effective hospital care to its citizens." N.J.S.A. 26:2H-18.51a. "Access to quality health care shall not be denied to residents of this State because of their inability to pay for the care[.]" N.J.S.A. 26:2H-18.51c. Federally qualified health-care centers receive special funding in order "to enable these centers to ... enhance and advertise their primary health care services as an alternative to hospital emergency rooms...." N.J.S.A. 26:2H-18.47a(4). Southern Jersey satisfies these charitable purposes.
In his decision the Tax Court judge relied heavily upon Weymouth Tp., where the court denied a property tax exemption for a medical facility's property. 7 N.J. Tax 589. Although the Weymouth Tp. court relied in part upon the facility's receipt of fifty percent of its funding from the government, Weymouth Tp. is factually distinguishable. In Weymouth Tp., the facility was started as a for-profit medical practice. As opposed to plaintiff's certificate of incorporation in this case, the taxpayer's certificate of incorporation in Weymouth Tp. did not preclude the taxpayer from engaging in non-exempt activities. The judge in Weymouth Tp. further found that "the organization of defendant corporation... was not completely altruistic." 7 N.J. Tax at 606. He found that the purpose of the formation of the medical center was to help rescue a financially disastrous investment, id. at 607, and the medical facility was in direct competition with other doctors, medical facilities and hospitals within a thirty-mile radius. Id. at 608. For these reasons, we do not find Weymouth Tp. analogous.
Rather, we find the reasoning in Catholic Charities v. City of Pleasantville, 109 N.J.Super. 475, 263 A.2d 803 (App.Div.), certif. denied, 56 N.J. 474, 267 A.2d 56 (1970), instructive. In Catholic Charities, we determined that a facility exclusively used as a nursing home to care for the aged, ill and infirm, was a charity entitled to a property tax exemption. In so holding, we relied on evidence that the facility in question generally admitted economically disadvantaged persons, as well as those receiving public assistance and welfare. We concluded that the facility performed a charitable function that benefitted the public at large by obviating the necessity on the part of the government to "construct facilities to accommodate the poor who are unacceptable to or who cannot afford the rates charged by nursing homes operating for profit." Id. at 480-81, 263 A.2d 803. The same analysis holds true in this case. As we have pointed out, the population served by Southern Jersey is poor and does not have immediate access to another low cost health-care facility. The record is silent concerning any other medical facilities in Pleasantville which would provide the same level of services at similarly reduced rates. Were Southern Jersey not available, the local residents would either not receive medical treatment or would seek treatment at hospital emergency rooms located in other towns. Or perhaps government would be compelled to step in and provide the services directly.
We are also guided by the Tax Court's decision in Salt & Light, where the taxpayer *130 claimed its properties qualified for a tax exemption because they were used to provide temporary housing and counseling services to homeless persons. 15 N.J. Tax at 280. In 1994, Salt & Light operated approximately twenty-four residences which were purchased with funds received from the United States Department of Housing and Urban Development or Federal Home Loan Grant funds. The residences were renovated through a combination of grants and funds generated by Salt & Light, including charitable contributions. Two-thirds of the residents received public assistance. To the extent they were able, the remaining one-third of the residents paid up to thirty percent of their income to Salt & Light as rent. The rental rates were below market. Individuals who had no source of income paid no rent. No one was turned away for financial reasons. The municipality argued that because most of Salt & Light's services were paid for by government agencies, no tax exemption was warranted. The Tax Court judge concluded that receipt of government subsidies on a fee-for-services basis, by itself, would not destroy an otherwise charitable use for purposes of local property tax exemptions. Id. at 285-86. Relying on Catholic Charities, the court found that "a truly charitable use is not necessarily vitiated by the receipt of government support on behalf of beneficiaries of the institution." Id. at 288.
The same reasoning applies here. The lion's share of the funds received by Southern Jersey which the Tax Court designated as government funds are program service revenues, paid to Southern Jersey in return for needed health-care services provided to persons who would otherwise not be able to afford them. The receipt of these funds does not diminish the charitable nature of the services rendered.
We are also not persuaded that simply because Southern Jersey receives less than one percent of its income from charitable donations that it should be disqualified from receiving the tax exemption. N.J.S.A. 54:4-3.6 is silent with regard to the need for a charity to receive donations to maintain its charitable status. Simply because the taxpayer does not engage in significant fund-raising does not lessen the importance of the services it provides to the community. Southern Jersey is exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code. It is also registered with the New Jersey Attorney General as a charity under the Charitable Registration and Investigation Act adopted in 1994. N.J.S.A. 45:17A-18 to -40. Although these standards do not govern local property tax exemptions, they bear upon Southern Jersey's right to receive charitable donations should it choose to actively solicit. See Presbyterian Homes, 55 N.J. at 286, 261 A.2d 143; Paper Mill, 95 N.J. at 528 n. 2, 472 A.2d 517 (Clifford, J. and Schreiber, J., dissenting). We find no authority to require significant private donations as a determining factor for a property tax exemption under N.J.S.A. 54:4-3.6. See State Dep't of Assessment and Taxation v. North Baltimore Ctr., Inc., 361 Md. 612, 762 A.2d 564, 569-71 (2000) (holding that a non-profit organization that does not receive significant private donations and is almost entirely supported by government funds may be entitled to a local property tax exemption).

III
This matter came before the Tax Court on cross-motions for summary judgment. On appeal, we use the same standard as the motion judge: we first decide whether there is a genuine issue of material fact, and if not, we then decide whether the Law Division's ruling on the law is *131 correct. See Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div.1998); Brill v. Guardian Life Ins. Co., 142 N.J. 520, 666 A.2d 146 (1995).
We recognize that a decision of the Tax Court should not be disturbed unless its findings are clearly arbitrary or not grounded in substantial evidence. Van Wingerden v. Lafayette Tp., 335 N.J.Super. 560, 561, 763 A.2d 294 (App. Div.2000) (citing Glenpointe Assoc. v. Township of Teaneck, 241 N.J.Super. 37, 46, 574 A.2d 459 (App.Div.), certif. denied, 122 N.J. 391, 585 A.2d 392 (1990)); Little Egg Harbor Tp. v. Bonsangue, 316 N.J.Super. 271, 285, 720 A.2d 369 (App. Div.1998). However, here we find the Tax Court placed undue emphasis upon the funds received by the taxpayer from government sources, without taking into consideration that the better part of the funds were received for services rendered, which equaled 74.4% of total revenues in 1997, 66.5% in 1998, and 75.7% in 1999. These funds are to be distinguished from government grants. Accordingly, we are satisfied that receipt of these funds by Southern Jersey does not impact upon its otherwise exclusive operation for charitable purposes. Having met all three prongs of the Paper Mill test, Southern Jersey is entitled to a local property tax exemption for the year 1999.
Reversed.
NOTES
[1] Judge King did not participate in oral argument. However, the parties consented after oral argument to his participation in this decision.
[2] The tax returns contain other incidental revenues which are not relevant to this opinion. Therefore, the total revenue line will not equal the revenues listed.
[3] Southern Jersey's tax returns describe program service revenues as "fees received from the rendering of health services. These revenues are used to provide a broad range of health services to a largely medically underserved population."
[4] Includes a $360,000 non-recurring grant to assist plaintiff's purchase of a property in Hammonton.
[5] Recent amendments to the statute do not affect our opinion.