**UNITED STATES of America, ex rel. Kathryn ERICKSON and Lonnie Hogan, Plaintiffs,**

v.

**UINTAH SPECIAL SERVICES DISTRICT aka Uintah Transportation Special Services District, Uintah Special Services Administrative Control Board, Uintah County, Uintah County Commission, Lloyd Swain, Defendants.**

No. 2:02CV581DAK.

United States District Court, D. Utah, Central Division.

June 6, 2005.

Evan A. Schmutz, M. Reed Adams, Hill Johnson & Schmutz LC, Provo, UT, for Plaintiffs.

Benson L. Hathaway, Jr., Stephen W. Geary, Kirton & McConkie, Jesse C. Trentadue, John D. Luthy, Michael W. Homer, Suitter Axland, Benjamin P. Thomas, Strong & Hanni, Salt Lake City, UT, for Defendants.

## MEMORANDUM DECISION AND ORDER

KIMBALL, District Judge.

This matter is before the court on Defendants Uintah Special Services District and the Uintah Special Services District Administrative Control Board's (collectively "USSD") Motion to Dismiss and Defendants Uintah County, Uintah County Commission, and Lloyd Swain's (collectively "Uintah County") Motion to Dismiss. A hearing on the motions was held on May 10, 2005. At the hearing, Plaintiffs were represented by Evan A. Schmutz, USSD was represented by Benson L. Hathaway, and Uintah County was represented by Jesse C. Trentadue. After carefully considering the pleadings, memoranda, and other materials submitted by the parties and the law and facts relating to this mat-ter, and now being fully advised, the court renders the following Memorandum Decision and Order.

## BACKGROUND

This is an action brought under the qui tam provisions of the civil False Claims Act. Relators filed their Complaint against Defendants under seal and the United States investigated the allegations. The United States declined to intervene. At that time, the Complaint was unsealed and served on Defendants.

Relator Erickson was employed by USSD as its District Manager from June 1996 to May 2001, when she was terminated. Relator Hogan was employed by Uintah County from 1973 to 1976 and from 1981 to 1991 as a heavy equipment operator, from 1991 to 1994 as the Assistant Road Superintendent, and from 1994 to 2000 as the Road Superintendent.

USSD is a special services district created by Uintah County under the Utah Special Services District Act, Utah Code Ann. § 17A–2–1301. By statute, a special services district is "a separate body politic and corporate and a quasi-municipal public corporation distinct from [the] county ... in which the service district is located." *Id.* § 17A–2–1313(1). However, "[t]he governing authority of the county ... in which the service district is located shall control and have supervisory authority over all activities of the service district." *Id.* § 17A–2–1313(2).

Defendant Uintah Special Services District Administrative Control Board ("Board") is the body delegated the authority to exercise the rights, powers, and authority of USSD, pursuant to Utah Code Ann. §§ 17A–2–1313(2)(a), –1326. Although separately named as Defendants, USSD and its Board are not distinct legal entities. Therefore, the court will refer to them collectively as USSD.

Relators' Complaint consists of four causes of action: (1) a False Claims Act claim against USSD, (2) a False Claims Act claim against Uintah County, (3) a retaliatory discharge claim by Relator Erickson against USSD, and (4) a retaliatory discharge claim by Relator Hogan against Uintah County. USSD moves to dismiss only the False Claims Act claim asserted against it. Uintah County moves to dismiss the False Claims Act claim and the retaliatory discharge claims asserted against it.

USSD receives mineral lease funds because of the public lands in Uintah County. Mineral lease funds come from "money received [by the Federal Government] from sales, bonuses, royalties ... and rentals of the public lands." 30 U.S.C. § 191. By statute, fifty percent of the money that the federal government receives is paid "by the Secretary of the Treasury to the State ... within the boundaries of which the leased lands or deposits are or were located." 30 U.S.C. § 191. The State is allowed to use mineral lease funds "as the legislature of the State may direct." *Id.* The Utah Legislature places thirty percent of the mineral lease monies it receives into the "Mineral Bonus Account." Utah Code Ann. § 59–21–1(3). The Utah Legislature gives forty percent of these funds annually to the Department of Transportation to allocate to counties and special service districts "in amounts proportionate to the amount of mineral lease money generated by each county." *Id.* § 59–21–2(h)(ii)(A).

In addition to USSD's receipt of mineral lease funds, Uintah County receives money from the federal government under the Federal Payment in Lieu of Taxes ("PILT"), 31 U.S.C. § 9601 *et seq.* However, to the extent that Uintah County receives funds from the federal government "under a payment law," which in-

cludes mineral lease funds, the payment of PILT monies must be reduced on a dollar-for-dollar basis. 31 U.S.C. § 6903(b)(1)(A). Although, the mineral lease funds paid to a special service district do not count against the county that service district is a part of, Relators claim that USSD's mineral lease funds were being used for the benefit of Uintah County and those funds should have been counted to reduce the county's PILT payments.

Relators specifically claim that USSD has submitted false claims to the Department of the Interior and BLM by:

(1) Falsely representing its status as a single purpose service district in compliance with Utah state law; and thereby falsely obtaining mineral lease funds while allowing Uintah County to obtain PILT funds without reduction as required by law;

(2) Falsely representing its qualifications to receive Mineral Lease Funds;

(3) Falsely representing that it was in compliance with applicable State and Federal regulations governing receipt, handling, and accounting of Mineral Lease Funds; and

(4) Making unauthorized and improper transfers of Mineral Lease Funds to the County and to other governmental and non-governmental entities within the county, under the false representation that the Mineral Lease Funds were being applied to authorized purposes.

Am. Compl. ¶ 18.

Relators claim that USSD was created by Uintah County "to receive mineral lease funds and to operate as a single purpose district, financially and politically independent from Uintah County, in administering such funds, for the construction, repair and maintenance of county roads." Am. Compl. ¶ 22. However, Relators claim that USSD "failed to act as a single purpose service district financially

and politically independent of Uintah County, or otherwise act in compliance with state and federal law and have further participated in conjunction with Uintah County ... in a scheme to obtain both mineral lease funds and PILT funds all of which were used as Uintah County general funds." Am. Compl. ¶ 20.

Relators itemize conduct that they believe constitute USSD's submission of false claims, including: 1) paying $11 million for the construction of Western Park Community Center with Mineral Lease monies; 2) funding most of the cost of the city/county airport from Mineral Lease monies, including snow removal, weed control, and equipment costs at the airport; 3) for at least three years, allowing the County to remove valuable deposits of tar sands that USSD had stockpiled for road repairs in 2001 for its own uses and without any accountability; 4) in 1997, performing bridge protection work using USSD contractors and County equipment at a cost of $500,000 without reimbursing the Mineral Lease monies and separately billing FEMA and the B–Road Fund for the work; 5) paying $780,000 in engineering fees from Mineral Lease Funds which were not accounted for and were not reimbursed and paying an additional $280,000 to the total costs without reimbursement or an accounting report; 6) allowing the County to use USSD's gravel for County purposes without reimbursement to USSD; 7) from 1988 to 1996, making "blank check" payments without accounting to Vernal City in order to assist Vernal City to qualify for receipt of CIB money; 8) paying $3 million to the County Road Department that was then placed in the County's general fund; 9) obtaining loans from CIB for the general benefit of the County; 10) paying over $800,000 to an engineering firm to engineer 91 miles of road although little or no engineering was actually performed; 11) awarding rock crushing projects to a contractor who billed for an amount in excess of the contract amount; 12) paying $100,000 for sand material for a walking path at Ashley Valley Water and Sewer; 13) allowing the County to take USSD materials without accounting for them; 14) supplying labor, housing, and equipment to the County Geographical Information System without receiving any benefit; 15) paying for gravel crushing that was then used by the County; 16) purchasing $30,000 worth of culverts which were then billed to the B–Road Fund; 17) funneling mineral lease funds to the Uintah Recreation District; 18) paying Hamaker Bottoms Pit with Mineral Lease funds for work not performed; 19) paying a contractor for materials for Glen Bench that failed to meet specifications so that the contractor could pay a subcontractor for work done on unrelated projects; 20) posting a $150,000 cash bond with the BIA for reclamation work and seeding that was substandard and not receiving the cash bond back after the job was finished; 21) paying $78,000 to the Ute Tribe in prepaid royalties for pit materials that were never used; 22) allowing USSD personnel to use USSD gas cards for their personal vehicles from 1990 to 1996; 23) giving CD's amounting to approximately $130,000 to an employee, a County Commissioner, and a Board member which was not for the payment of services or salary; 24) paying more than $10,000 for airport building improvements in order to pay the County for the use of the building when the County had agreed to $10,000; and 25) paying $40,000 to the County Commission to pay for legal work for a right of way for Uintah County in Grand County.

Relators claim that Uintah County's false claims activity included the receipt of PILT money while also accepting and using mineral lease funds given to USSD for

general County purposes and operated USSD as a sham entity. Relators further contend that Uintah County, as the governmental entity authorized to received B–Road Funds,[1] has submitted false claims to the Department of the Interior and BLM, including: 1) commingling mineral lease funds and B–Road funds in the general county fund; 2) misrepresenting the miles of B–Road funds and/or improvements to B–Road funds in the County; 3) falsely representing its qualifications to receive B–Road funds; 4) falsely representing that it was in compliance with applicable state and federal regulations governing the receipt, handling, and accounting of B–Road Funds; and 5) making unauthorized and improper transfers of B–Road funds to other governmental and non-governmental entities within the County.

Relators also allege that Uintah County has breached the terms and conditions of participation in the B–Road Funds program and has violated the provisions of State and Federal Law by: 1) making transfers of "excess" B–Road Funds to the County's general fund for unauthorized and illegal uses of federal funds; 2) applying or expending B–Road Funds to pay for County projects not qualified for the expenditure of B–Road Funds; 3) making duplicate or multiple payments for reimbursement of County expenses in performing work or providing equipment on qualified B–Road Funds projects; 4) making double payments on vendor invoices with the intent to obtain a reimbursement and depositing reimbursement checks back to general funds; 5) making unauthorized modifications to the County Road Department budget for purposes of making improper claims on B–Road Funds; and 6) making payments to vendors and contractors of B–Road projects when no work was

performed or insufficient work was performed to justify the payment.

The Amended Complaint then lists the following false claims and improper uses of the B–Road Funds, including: 1) paying approximately $30,000 per year from 1991 through 1997 for maintenance, painting and repair of the County Sheriff's Office vehicles from B–Road Funds; 2) paying for maintenance and construction of the Western Park Community Center, including the parking lots, sand arenas, rodeo grounds, and leveling and building of the ice hockey rink and using B–Road funds for a Ford truck, a Dodge pickup truck, a 1986 Blazer, a dump truck and a water truck for use at the Community Center; 3) paying for repairs to County vans used by the Golden Age Center from B–Road Funds from 1991 through 1998; 4) transferring heavy equipment, such as a bulldozer and a scraper, from the County Road Department to the County Landfill even though the equipment was purchased with B–Road Funds; 5) paying for snow removal, weed control, and equipment costs at the City/Airport from B–Road Funds; 6) purchasing equipment from a vendor and then authorizing checks to be drawn on B–Road Funds for double the amount of the cost of equipment and depositing overpayments received from vendors in the County General Fund; 7) charging road improvements done on SR 121 in 1998 and 1999 to the B–Road Funds without processing a request for funds from the federal highway grants or UDOT; 8) purchasing a 350 Road Reclaimer at a cost of $364,000 to strip asphalt and selling or trading it after 1500 hours for $75,000 even though it had most of its useful life remaining and depositing the proceeds in the general fund, after which the county contracted for asphalt removal for approxi-

---

**1.** Although the Amended Complaint repeatedly refers to "B–Road Funds," it never defines what a B–Road is or the statutory or regulatory basis for such funds.

mately five times the County's cost using the Road Reclaimer even though the County had received competitive bids for approximately half the costs of the awarded contract; 9) charging B–Road Funds to pay for the immediate costs of emergency disasters and depositing reimbursements from FEMA into the County's general fund; 10) charging the shop costs of the County Road Department to USSD and using B–Road Funds to pay for the County's fleet maintenance; 11) using $100,000 of B–Road funds for the White Rocks Highway Project and receiving a $204,000 reimbursement from the Bureau of Indian Affairs/Ute Tribe and depositing the profit into the general fund; 12) having USSD pay in excess of $780,000 for engineering fees on the White Rocks Highway Project and depositing reimbursement in the County's general fund; 13) receiving $3 million from B–Road Funds for the County Road Department which was placed in the general fund by the Auditor; 14) extending the Hunter Hill contract to a crushing contract at Seep Ridge for a costs of $1,500,000 and billing both USSD and the B–Road Funds for the same work; 15) giving a County Road Department Bronco to the State Extension Office without accounting for it as a gift or receiving any reimbursement; 16) using $60,000 of B–Road Funds for drilling of native tar sands when there was no agreement and no benefit to the County; 17) paying Burdick Paving its full contract price to crush rock although the site for the rock crushing was changed and it was no longer necessary for Burdick Paving to construct a crusher pad and road to the crusher; 18) using B–Road Funds to buy a Dodge Durango for the County Commission and a 1995 Chevrolet Silverado for the Sheriff's Department for animal control; 19) retaining the interest earned on deposits of B–Road Funds and reporting no interest in the annual reports provided to the State Auditor; 20) violat-

ing the B–Road Fund's regulation that any expenditure over $100,000 in a single year without competitive bidding with respect to the Stanton Road in 2001; 21) using crushed gravel that was paid for by USSD and then double charging the B–Road Funds; 22) double billing the B–Road Fund for $30,000 worth of culverts and installation and placing the additional money in the County's general fund; 23) billing USSD and the B–Road Fund for a landfill scraper used on the Diamond Mountain Road and putting the USSD into the County's general fund.

After the Amended Complaint was served on Defendants, all Defendants brought motions to dismiss.

## DISCUSSION

USSD has moved to dismiss Relators Erickson and Hogan's first claim for relief, which asserts a violation of the False Claims Act, for failure to plead fraud with particularity and failure to state a claim upon which relief can be granted. Uintah County has moved to dismiss Relators' Second Cause of Action, which asserts a violation of the False Claims Act, for failure to plead fraud with particularity and has moved to dismiss Relator Hogan's Fourth Cause of Action for failure to state a claim upon which relief can be granted.

### *Defendant USSD's Motion to Dismiss*

USSD argues under Rule 12(b)(6) of the Federal Rules of Civil Procedure that the first claim for relief should be dismissed with prejudice because, as a matter of law, no claims are submitted for mineral lease funds, it cannot misrepresent its status as a special service district, and USSD cannot conspire with Uintah County with respect to the receipt of funds. USSD also argues under Rule 9(b) of the Federal Rules of Civil Procedure that the first claim for relief should be dismissed because Rela-

tors identify who or when claims were made to the federal government and, therefore, Relators cannot plead fraud with particularity.

### A. Rule 12(b)(6)

■ The False Claims Act sets forth various ways in which a false claim may be established. Under subsection (1), a false claim may be established if the defendant presented or caused to be presented a claim for payment to an agent of the United States. Under subsection (2), the defendant is liable if the defendant uses or causes someone else to make or use a false statement to get a claim paid or approved by the government. Subsection (3) prohibits conspiracies to defraud the government through false claims. "The FCA reaches any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government." *United States v. Mackby,* 261 F.3d 821, 827 (9th Cir.2001).

In this case, Relators allege in their Amended Complaint that USSD has submitted false claims to the Department of Interior and BLM by:

(1) Falsely representing its status as a single purpose service district in compliance with Utah state law; and thereby falsely obtaining mineral lease funds while allowing Uintah County to obtain PILT funds without reduction as required by law;

(2) Falsely representing its qualifications to receive Mineral Lease Funds;

(3) Falsely representing that it was in compliance with applicable State and Federal regulations governing receipt, handling, and accounting of Mineral Lease Funds; and

(4) Making unauthorized and improper transfers of Mineral Lease Funds to the County and to other governmental and non-governmental entities within the county, under the false representation that the Mineral Lease Funds were being applied to authorized purposes.

Am. Compl. ¶ 18.

■ Relators argue that even in the absence of any explicit certification, under the circumstances presented in the present case, Defendants have violated the FCA by impliedly certifying qualification or entitlement to government funds. In *Shaw v. AAA Engineering and Drafting, Inc.,* 213 F.3d 519, 531 (10th Cir.2000), the court held that the language of Section 3729(a) "requires only a presentation of a false or fraudulent claim for payment or approval without the additional element of a false record or statement.... Thus FCA liability under section 3729(a)(1) may arise even absent an affirmative or express false statement by the government contractor." The FCA "extends to all fraudulent attempts to cause the government to pay out sums of money." *Id.* "[A] false claim under the FCA 'may take many forms, the most common being a claim for goods or services not provided, or provided in violation of contract terms, specifications, statute, or regulation.'" *Id.*

In *Shaw,* however, the defendant contracted to provide silver recovery services while it processed film for the government, and defendant's monthly invoices impliedly certified that it had complied with the silver recovery provisions in the contract. *Shaw,* 213 F.3d at 531. No such contract exists in this matter and no one submitted an invoice or other request for USSD's mineral lease funds or the County's PILT funds.

■ Relators argue that implied certification extends to circumstances in which a claim for money is received not by the presentation of a false statement, but by a

defendant's failure to provide sufficient information to allow a correct determination of whether such a claim is properly allowed. In *BMY–Combat Systems Div. of Harsco Corp. v. United States,* 38 Fed.Cl. 109 (1997), the court held that the deliberate withholding of information is actionable under the FCA because "the withholding of 'information critical to the decision to pay—is the essence of a false claim.' " *Id.* at 125. Further, an implied representation that the party qualified for government pay may constitute a false claim for payment. *Id.*

While there are cases broadly defining what may constitute a violation of the FCA, the common thread running through those cases is that there be some kind of claim. In this case there is no relationship between USSD and the federal government with respect to mineral lease funds. Mineral Lease Funds come from "money received [by the federal government] from sales, bonuses, royalties ... and rentals of the public lands." 30 U.S.C. § 191. By statute, fifty percent of the money that the federal government receives is paid "by the Secretary of the Treasury to *the State* ... within the boundaries of which the leased lands or deposits are or were located." *Id.* (emphasis added). USSD has no role—and is not alleged to have any role—in the collection, calculation, or distribution of mineral lease funds. The State is free to use the funds it receives from the federal government "as the legislature of the State may direct."

■ The Utah Legislature places thirty percent of the Mineral Lease monies it receives into the "Mineral Bonus Account." Utah Code § 59–21–1(3). The Department of Transportation receives forty percent of these funds annually to allocate to counties and special service districts "in amounts proportionate to the amount of mineral lease money generated by each county." *Id.* § 59–21–2(h)(ii)(A). Thus, Mineral Lease Funds are received by the State without any restrictions or regulations governing its use. And, Mineral Lease Funds received by USSD are disbursed from the State, at the State's determination, without any involvement from the federal government. Accordingly, USSD does not submit any claim—true or false—for Mineral Lease Funds to the federal government. Relators do not try to identify any statute, rule or regulation requiring the submission of any claim, request, demand, or report for USSD's receipt of those funds. USSD cannot falsely represent that it was in compliance with applicable Federal regulations governing receipt, handling and accounting of Mineral Lease Funds, as alleged by Relators, because there are no such regulations. If there are state regulations regarding the use of the funds and USSD was making unauthorized and improper transfers of Mineral Lease Funds to other entities, it would be a breach of a state regulation, not a violation of the federal False Claims Act.

■ The only remaining false representation claimed by Relators is that USSD falsely represented its status as a single purpose service district in compliance with Utah state law and thereby falsely obtained mineral lease funds while allowing Uintah County to obtain PILT funds without reduction as required by law. Additional federal funding, in addition to the Mineral Lease Funds, is obtained by Uintah County under 31 U.S.C. § 9601–9607, ("PILT"). The purpose of PILT is to assist local governments by partially compensating for lost revenue occasioned by the existence of federal lands in the locality, which results in a reduction of lands available for local property tax. However, PILT reimbursements are not available where other "payment laws"

compensate the local governments. PILT specifically provides that "a payment under Section 6902 of this title is equal to the greater of 75 cents for each acre of entitlement land located within a unit of general local government . . . reduced . . . by the amounts the unit received in the prior fiscal year under a payment law." 31 U.S.C. § 6903(b)(1). PILT defines the Mineral Leasing Act as a payment law. 31 U.S.C. § 6903(a)(1)(h). Therefore, local governments must reduce any PILT payments they would otherwise be entitled to receive by the amount of all mineral lease funds received in the preceding year.

Relators allege that if the mineral lease money received by USSD is paid to or considered to have been received by Uintah County, then the PILT payments that the County receives would necessarily be required to be reduced by the amount of money received from Mineral Lease Funds. Relators contend that Defendants' failure to disclose their receipt of mineral lease money constitutes a violation of the FCA.

In 1986, the Comptroller General of the United States opined that

> Congress did not intend that payments to local governments under the Act be reduced by amounts which, by virtue of state law, merely pass through these governments on the way to politically and financially independent school or single purpose districts which are alone responsible for providing the services in question. Such payments are not meaningfully received by local governments, which would be acting solely as "conduits" for the funds. This is the only exception to the deduction requirement of Section 6903(b).

65 Comp. Jen. 849, 851–52.

Relators assert that in order to fit within the above stated exception, USSD must operate within its single purpose mandate of accepting Mineral Lease Funds to conduct general road work in Uintah County. However, Relators allege that after Uintah County established USSD for obtaining the Mineral Lease Funds, USSD acted in concert with Uintah County to transfer the Mineral Lease Funds into the general coffers of Uintah County to be applied to general county budgetary expenses and has provided payment and funding for services and capital expenditures far beyond the single purpose for which USSD was created.

However, under Utah statutes, a county or other local government entity may establish a special service district for any one of thirteen enumerated purposes or any combination of them. Utah Code Ann. § 17A–2–1304 (1)(a). Utah law does not recognize or distinguish between a single purpose service district and any other type of special service district. No special status is accorded to a district depending on how many of these purposes are allotted to it. Therefore, there is nothing to indicate that USSD could misrepresent its nature as a service district.

In addition, there is no statutory support for Relators' assertion that USSD must use Mineral Lease Funds for road work. The court already found that there are no requirements for the use of Mineral Lease Funds attached by the federal government. If the State attaches requirements to the use of the funds, then the state may have a claim against USSD but it is not a Federal False Claims Act claim.

Moreover, most of the additional "False Claims activity" alleged against USSD is expressly within USSD's statutory authority. For example, USSD is authorized to "enter into contracts . . . to carry out the functions of the service district, including, the power to enter into contracts with . . .

counties [and] municipalities." Utah Code Ann. § 17A–2–1314(1)(c). It has "[t]he right to utilize any officers, employees, property, equipment, offices, or facilities of the county ... which established the service district." *Id.* § 17A–2–1314(1)(g). And, all special service districts, regardless of their established purpose, are authorized to engage in snow removal "to more effectively carry out the purposes of those special service districts." *Id.* § 17A–2–1304(1)(b).

USSD also claims that it cannot be part of any conspiracy—and the United States cannot be the victim of any false claim—regarding Uintah County's receipt of PILT monies. PILT monies are paid by the federal government to the State and local government units "for any governmental purpose." 31 U.S.C. § 6902(a)(1). This conspiracy claim, therefore, rests on Relators' allegation that USSD falsely represents that it is "financially and politically independent of Uintah County ... in a scheme to obtain both mineral lease funds and PILT funds all which are used as Uintah County general funds."

■ However, by statute, once USSD was created, it was and is "a separate body politic and corporate and a quasi-municipal public corporation distinct from [the] county ... in which the service district is located." Utah Code Ann. § 17A–2–1212(1). Thus, USSD cannot misrepresent its legal existence as an entity distinct from the County. Notwithstanding USSD's existence as a distinct legal entity, "the governing authority of the county ... in which the service district is located shall control and have supervisory authority over all activities of the service district." *Id.* § 17A–2–1313(2). Furthermore, "[t]he county ... that created the district may revoke in whole or in part any power or authority delegated to an administrative control board or other officers or employ-

ees." *Id.* § 17A–2–1326(6). Also, the County may dissolve USSD. § 17A–2–1321. Therefore, despite USSD's existence as a distinct legal entity, by statute, it is also under the control of the County. USSD cannot misrepresent its dependence or independence from the County. The relationship between USSD and the County is not an issue of fact-it is an issue of law dictated by the governing Utah statutes. A claim of fraud cannot be predicated upon an asserted misrepresentation of law. Everyone has access to the law and may be presumed to know it. *Utah Power & Light v. Federal Ins. Co.,* 983 F.2d 1549, 1556 (10th Cir.1993).

USSD asserts that Relators also cannot identify any claim involved with the County receiving PILT funds. Like the Mineral Lease Funds, PILT funds are not paid out pursuant to any request or demand. The only report made is by the Governor to the Secretary of the Interior to identify "the amount of payments the State transfers to each unit of general local government in the State out of amounts received under a payment law." 31 U.S.C. § 6903(b)(2). That is a State report based upon information prepared and kept by the State since it disperses the funds received under the "payment laws" without any input from USSD or the County.

Relators fail to establish that it is improper for the County to receive PILT funds without offset for USSD's receipt of Mineral Lease Funds. The allegations expressly concede that the Mineral Lease Funds are received by USSD, not the County, and the statute at issue requires offset only for "amounts the unit [the County] received." 31 U.S.C. § 6903(b)(1)(A). Relators only contrary authority from the Comptroller General is neither controlling nor on point. Comptroller General opinions are advisory. *See Association of Civilian Technicians v.*

*Federal Labor Rel. Auth.,* 269 F.3d 1112, 1115–16 (D.C.Cir.2001). And, the opinion relied on by Relators does not address the question presented in this case. The opinion notes that when funds, such as the Mineral Lease Funds, are "received by" the County but then passed on to an independent entity, such as school districts, there is no reduction in the County's PILT funds. In this case, the funds are received by USSD, which is a distinct legal entity, which, then, according to Relators' allegations, pays some of those funds to the County.

Relators' false claims argument boils down to the assertion that USSD and the County made a false claim simply by the creation of USSD and its designation as the entity authorized to receive Mineral Lease Funds. They do not cite authority for this proposition, however. USSD cannot falsely represent itself as a single purpose service district because Utah law states that a service district can be set up for one or several different purposes, without distinction. USSD likewise cannot misrepresent its legal relationship to the County. By Utah law, USSD is a separate body politic. Utah Code Ann. § 17A–2–1313(1). Accordingly, the court concludes that Relators have not stated a False Claims Act case against USSD as a matter of law. Accordingly, USSD's motion to dismiss is granted.

**B. Rule 9(b)**

 Because a False Claims Act claim is a claim of fraud, USSD is also moving to dismiss Relators' Complaint for failure to plead fraud with particularity under Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) of the Federal Rules of Civil Procedure provides that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

Fed.R.Civ.P. 9(b). "Rule 9(b) requires a plaintiff to identify 'the time, place and content of each allegedly fraudulent representation or omission, and to identify the consequences thereof.'" *Anderson v. First Sec. Corp.,* 249 F.Supp.2d 1256, 1260 (D.Utah 2002). Similarly, any charge of conspiracy to commit fraud must consist of specific factual allegations, not general or conclusory statements. *Lochhead v. Alacano,* 697 F.Supp. 406, 414 (D.Utah 1988). Failure to allege fraud with particularity constitutes a failure to state a claim for relief resulting in dismissal under Rule 12(b)(6). *See Sunrise Financial v. Painewebber,* 948 F.Supp. 1002, 1008 n. 4 (D.Utah 1996).

To make out a False Claims Act claim against USSD, Relators must allege that USSD "knowingly present[ed] or cause[d] to be presented, to an officer or employee of the United States Government … a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1). The court has already concluded that, as a matter of law, Relators cannot make out a claim under the False Claims Act. Therefore, Relators failure to allege that USSD submitted a false claim regarding the complained of activities to an officer or employee of the United States government to get a payment or approval cannot be cured. Because of the governing statutes, an amendment of the Complaint would be futile. Likewise, there is no basis for allowing discovery to be conducted.

### *Uintah County's Motion to Dismiss*

Uintah County, Uintah County Commission and former Uintah County Commissioner Lloyd Swain (collectively "the County") move to dismiss Relators' two claims directed at them, the Second and Fourth Claims for Relief. The Second Claim for Relief alleges a violation of the False Claims Act and the Fourth Cause of Action alleges a wrongful discharge claim

under the False Claims Act's retaliatory provisions for the discharge of Relator Hogan.

## I. Rule 9(b)

The County makes the same Rule 9(b) arguments that USSD asserted. Relators have not pled their FCA claim with enough particularity because they do not allege when any of the false representations were made, who made them, or to whom they were made. The court has already concluded that, as a matter of law, there could not have been a conspiracy between USSD and the County with respect to the receipt of both Mineral Lease Funds and PILT. Therefore, Relators are unable to state with particularity a false claim made to the federal government. Although the Relators argue that the County falsely implied that it met the requirements for the receipt of PILT monies, there is no basis in the governing statutes to support that the County was not entitled to those funds. Accordingly, no amount of discovery or factual allegations can overcome this failure. Therefore, the County's motion to dismiss the Second Claim for Relief is granted.

## II. Hogan's Wrongful Discharge Claim

### (a) County Commission and Lloyd Swain

■■■■ The County asserts that Hogan's wrongful discharge claim is defective because he does not allege any actionable wrongdoing by the Uintah County Commission or Lloyd Swain and that failure alone entitles those Defendants to dismissal. Also, neither the Uintah County Commission nor Swain are employers subject to liability under 31 U.S.C. § 3730(h). *See United States ex rel. Sieweck v. Jamieson Science and Eng'g, Inc.*, 322 F.3d 738 (D.C.Cir.2003) (President and CEO of employer was not an "employer" within the

meaning of the False Claims Act and thus could not be held liable in individual capacity). The existence of an employment relationship exposing one to liability under § 3730(h) is a question of law, not fact. *See Yesudian v. Howard University*, 270 F.3d 969, 972 (D.C.Cir.2001).

Hogan argues that his claim against Uintah County Commission and Lloyd Swain is proper because governmental officials and, in particular, county commissions are employers and subject to suit under the FCA for retaliation. *See Samuel v. Holmes*, 138 F.3d 173 (5th Cir.1998) (allowing a claim to proceed against government officials individually and concluding that no qualified immunity attaches to governmental officials).

However, *Samuel v. Holmes*, 138 F.3d 173 (5th Cir.1998) involved Plaintiffs who sued the Commissioners rather than the Commission because the Commissioners had terminated the Plaintiff based upon FCA activities. In *Fury v. County Court of Wood County*, 608 F.Supp. 198 (D.W.Va. 1985), the court allowed a FLSA claim to go forward against county officers because they were plaintiff's employer pursuant to West Virginia statute. Utah law does not define the County Commission as a political subdivision. The County Commission is not a person suable under the FCA for retaliation. Furthermore, the Amended Complaint does not specifically allege that the County Commission or that Swain fired him or terminated his employment. It also does not refer to either of them as Hogan's employer. Therefore, Hogan has no retaliatory discharge claim against the Uintah County Commission or Defendant Swain. Therefore, the Fourth Claim for Relief is dismissed as to those defendants.

### (b) Uintah County—Notice

■■■■ The County further argues that a key element of a § 3730(h) retaliato-

ry discharge claim is that the employer was aware that the employee was contemplating a case under the FCA. The employer must be aware that the employee's activities were a precursor to suit under the FCA rather than a mere voicing of disapproval or a suggestion for improvement. *See Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730, 733 (7th Cir.1999). Thus, to state a § 3730(h) claim, Hogan must establish that: (1) his employer had knowledge that he was engaged in establishing a FCA case; and (2) that he was discriminated against because of that activity. *See Yesudian*, 153 F.3d at 736. The County contends that Hogan's pleadings fall short of this requirement and his claim should also be dismissed against Uintah County.

Hogan asserts that he properly alleged notice as required under § 3730(h). Hogan claims that the allegations in paragraphs 47–49 of the Amended Complaint specifically establish that Hogan's attempts to investigate the allegedly fraudulent practices of Defendants. Those paragraphs provide as follows:

47. Hogan disapproved of the fraudulent and illegal practices of Uintah County, as described in the preceding paragraphs and voiced his disapproval of and refusal to participate in such practices. Hogan attempted to and engaged in an effort to investigate the fraudulent and deceitful practices of Uintah County in order to bring to a halt these illegal practices, to initiate this claim, and to provide assistance and proffered testimony to representatives of the United States government for the furtherance of such claim. Hogan reported the deceitful and illegal practices of Uintah County to representatives of state and federal government.

48. In direct response to and in retaliation for Hogan's activities described in the preceding paragraph, Uintah County, through its agents and employees, threatened, harassed, demoted, and ultimately discharged Hogan, within the meaning of 21 U.S.C. § 3730(h), because of the lawful acts which he had undertaken to stop the fraudulent practices of Uintah County and to prevent their further occurrence.

49. Uintah County's actions in threatening, harassing, demoting and discharging Hogan were undertaken for the purpose of and with the intent of preventing Hogan from further investigation and from further disclosure of information regarding the fraudulent and illegal practices of Uintah County as to protect Uintah County from having such practices discovered by the United States and the individual actors brought to justice.

Hogan contends that a FCA retaliation "claim does not require the plaintiff to develop a winning qui tam action before he is retaliated against." *Yesudian*, 153 F.3d at 736. It requires only that the plaintiff have engaged in "acts ... in furtherance of an action under this section." 31 U.S.C. § 3730(h). Hogan does not specifically allege that Uintah County had knowledge that he was engaging in establishing a FCA case, but his allegations as to Uintah County are that he reported its allegedly deceitful and illegal practices to representatives of the state and federal government and was retaliated for making such reports. Although the County contends that he does not allege that reports were made directly to his employer, Uintah County, it is implied in the fact that they retaliated against him for his reports to other entities that Uintah County had notice of such reports. Because Hogan need not have a successful

FCA claim to have an FCA retaliation claim and the allegations of the Complaint can be read to allege notice to the County, the court concludes it would be inappropriate to dismiss Hogan's retaliation claim against Uintah County at the motion to dismiss stage.

### III. Common Law Claims

The County moves to dismiss any common law claims that may be asserted based on the broad language of the Amended Complaint. However, Relators acknowledge that the Amended Complaint does not present a claim or remedy under common law independent of the FCA. Therefore, the County's request is moot.

### CONCLUSION

For the foregoing reasons, USSD's Motion to Dismiss Relators' First Claim for Relief is GRANTED, Uintah County's Motion to Dismiss the Second Claim for Relief is GRANTED, and Uintah County's Motion to Dismiss the Fourth Claim for Relief as stated against Uintah County Commission and Lloyd Swain is GRANTED and as stated against Uintah County is DENIED.